**MICHIGAN STATE CHAMBER OF COMMERCE, a Michigan non-profit corporation, individually and for its members; E. James Barrett; Consumers Power Company, a Michigan corporation; the Detroit Edison Company, a Michigan corporation; and Michigan Consolidated Gas Company, a Michigan corporation, Plaintiffs-Appellants,**

v.

**Richard H. AUSTIN, in his capacity as Secretary of State of the State of Michigan, Defendant-Appellee.**

**No. 84–1833.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 9, 1986.
Decided April 21, 1986.

John D. Pirich, argued, Miller, Canfield, Paddock & Stone, Lansing, Mich., and Kirk D. Messmer, for plaintiffs-appellants.

Frank J. Kelly, Atty. Gen., Lansing, Mich., Gary P. Gordon and Richard P. Gartner, argued, for defendant-appellee.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and PORTER, Senior District Judge.[*]

---

* The Honorable David Porter, Senior Judge, United States District Court for the Southern District of Ohio, sitting by designation.

LIVELY, Chief Judge.

This appeal presents issues of justiciability. The plaintiffs sought a declaratory judgment that a Michigan statute limiting the amount corporations may contribute to a "ballot question committee" violates the First Amendment guarantees of freedom of speech and association. The district court concluded that the action failed to present a case or controversy for adjudication upon determining that the plaintiffs were no in immediate danger of sustaining injury as a result of the defendant's intention to enforce the statute. The district court dismissed the complaint without prejudice and the plaintiffs appealed.

## I.

The Michigan Campaign Finance Act (the Act), Michigan Compiled Laws Annotated (M.C.L.A.) §§ 169.201–169.282, was enacted in 1976. Section 54 of the Act deals with contributions by corporations and makes knowing violation a felony punishable by fines against corporate violators and fines and imprisonment for individual violators. Section 54(3) limits contributions to ballot question committees:

Sec. 54 .... (3) A corporation ... except a corporation formed for political purposes, shall not make a contribution or provide volunteer personal services ... in excess of $40,000.00, to each ballot question committee for the qualification, passage, or defeat of a particular ballot question....

The plaintiffs filed this action on June 9, 1983. They are the Michigan State Chamber of Commerce (the State Chamber), its president, E. James Barrett, and the three largest investor-owned public utilities in Michigan. The defendant Austin is the Michigan Secretary of State, who is charged with enforcement of the Act. The complaint alleged that the defendant had enforced § 54 during the 1982 general election and would do so in the future, and would enforce it particularly against the plaintiff utilities. The complaint recited that since before 1950 at least one ballot proposal or constitutional amendment had

been placed on the ballot of every Michigan general election. The plaintiffs asserted, on information and belief, that at least one proposition would be placed on the 1984 ballot that would have a direct impact on the ability of the utilities to furnish services to the public at reasonable rates and to provide a reasonable return for their investors.

The complaint then stated that each of the plaintiff utilities intended to "contribute more than $40,000 to at least one ballot question committee for the 1984 election for expenditures in support of or in opposition to at least one ballot question or constitutional amendment." Adverting to the brief time available between certification of ballot issues and election dates, the plaintiffs stated in paragraph 26 of the complaint:

If Plaintiffs wait until such a ballot proposal is certified before bringing an action for declaratory judgment and injunctive relief, it will be too late to obtain a prompt final judicial determination.

In his answer the defendant admitted that "he has made known and has published his intention to seek enforcement of this section [§ 54 of the Act] in the future." He denied that enforcement of § 54 would violate the United States Constitution by unlawfully abridging the plaintiffs' rights to freedom of speech and association. As an affirmative defense the defendant stated:

This Court is without jurisdiction over Defendant or the subject matter of Plaintiffs' Complaint for the reason that Plaintiffs have failed to allege an actual controversy involving § 54 of the Michigan Campaign Finance Act:

\* \* \* \* \* \*

Plaintiffs' allegations relative to future ballot questions, and the amount of moneys which they intend to contribute, represent mere speculation inasmuch as Plaintiffs have failed to allege and specifically identify any particular question which will be appearing on the ballot in the future.

## II.

On September 20, 1983 the plaintiffs filed a motion for summary judgment with supporting documents. The defendant responded with a motion to dismiss. After limited discovery the district court held a hearing on both pending motions. The court issued a memorandum opinion on December 28, 1983 in which it determined that the case presented an "active case or controversy," and on this basis denied the defendant's motion to dismiss for lack of jurisdiction. See *Michigan State Chamber of Commerce v. Austin,* 577 F.Supp. 651, 655–56 (E.D.Mich.1983). The court took the plaintiffs' motion for summary judgment under advisement "in order to afford the parties an opportunity to collect evidence and present it at an evidentiary hearing to be scheduled by this court." *Id.* at 656. Postponement of a ruling on the motion for summary judgment was required, according to the district court, in order to give the defendant an opportunity to provide an evidentiary record demonstrating that the state had a compelling need for limitations on corporate contributions to ballot question committees.

After depositions were taken and other evidentiary materials were filed the plaintiffs renewed their motion for summary judgment. The district court held a hearing on July 9, 1984 at which the judge reiterated his previous holding that the action presented a case or controversy, and attorneys for all parties agreed that there was no issue with respect to this conclusion. In discussing whether there was any urgency in reaching a decision the attorney for the defendant advised the court that the proposition originally identified by the plaintiffs would not be on the November 1984 ballot. This was a proposal by a consumer protection organization, the Michigan Citizens Lobby, to initiate a new article to the Michigan Constitution that the utility plaintiffs vigorously opposed. The attorney stated that the only ballot question that could likely appear on the 1984 ballot was a so-called "Voter's Choice" initiative. Counsel for the plaintiffs advised the court that his clients were primarily interested in the Citizens Lobby proposal, but that some members of the State Chamber were interested in opposing the Voter's Choice proposal. The court adjourned the hearing in order to study the record after permitting counsel to present oral arguments.

The next hearing was held on August 20, 1984. Just prior to the hearing an attorney for the plaintiffs filed an affidavit which stated that the Citizens Lobby had drafted and submitted to the Board of State Canvassers (the Board) "for approval as to form" a petition to initiate a new article to the Michigan Constitution and that the Board had approved it as to form only. This was the same proposal previously identified by the plaintiffs. The affidavit stated that the Citizens Lobby was circulating a petition to initiate the proposed constitutional article and planned to submit the petition to the Board to qualify the proposal for the 1986 general election ballot.

The affidavit also asserted that if the Voter's Choice proposal qualified for the 1984 ballot, several corporate members of the State Chamber intended to contribute more than $40,000 to the "Promote Michigan Committee" to oppose the Voter's Choice initiative.

At the beginning of the August 20 hearing the district judge said he was reopening the case or controversy question because he realized that none of the proposals that had been contemplated earlier would be on the 1984 ballot. The court indicated that unless the Voter's Choice proposal "made it," there appeared to be no case or controversy. Counsel for the plaintiffs argued that the continued activity of the Citizens Lobby on behalf of the proposed constitutional amendment provided an actual controversy and that parties affected by § 54(3) could not wait until a proposal was certified for the ballot before challenging it, because of the short interval between certification and the election.

The district court advised that it was no longer concerned with the Citizens Lobby proposal since it would not appear on the

1984 ballot. The court stated that it would find a case or controversy established if two conditions were met: if the Board put the Voter's Choice proposal on the 1984 ballot and if contributors would tell him that they intended to contribute more than the statutory amount to a committee opposing that initiative.

Though the Voter's Choice proposal was certified for the 1984 ballot the plaintiffs did not present affidavits on behalf of corporations stating that they intended to contribute more than $40,000 to the Promote Michigan Committee in opposition to the proposal. Instead plaintiff Barrett filed an affidavit in which he stated that the Board of State Canvassers had certified a "Proposal A" for the 1984 ballot which would permit the legislature to approve or disapprove any rule proposed by an administrative agency. A ballot question committee to support this proposal had been established. The affidavit stated that the State Chamber had contributed $5,000 to this committee and specifically intended to contribute an additional $36,000 immediately after the court declared § 54(3) unconstitutional.

On September 28, 1984 the district court issued its unpublished opinion finding no justiciable cause. The court stated that the plaintiff had claimed imminent injury from a ballot proposal that would adversely affect the financial operations of the utilities and that this proposal had not been certified for the 1984 ballot. No other ballot proposal adversely affecting the ability of the utilities to render services for reasonable rates while providing a fair return for their shareholders had qualified for the 1984 ballot. Though the Voter's Choice proposal did qualify, the plaintiffs failed to meet the second requirement outlined by the court at the August 20 hearing; they did not provide affidavits that corporate contributors were prepared to contribute more than $40,000 to the Promote Michigan Committee in opposition to Voter's Choice. Instead, the plaintiffs attempted to "manufacture" a controversy by embracing Proposal A and its committee. While concluding that Barrett's affidavit regarding contributions in support of Proposal A technically established the existence of a case or controversy, the district court found it not credible in view of the plaintiffs' "twisted and tortured path to the courthouse." Thus, the court concluded that only a "fictional" case or controversy was presented. The opinion stated:

> In light of Plaintiffs' failure to establish that Michigan Campaign Finance Act § 54 threatens the Chamber of Commerce or any other corporation with immediate injury, I find that no Article III "case or controversy" is present.

## III.

### A.

▮ In the federal courts the first requirement of justiciability is that a claim satisfy the "case or controversy" requirement of Article III of the Constitution. In declaratory judgment actions it is often difficult to draw a line between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies. Writing for a unanimous Supreme Court in *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), Justice Brennan adopted the following test:

> "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Id.* at 108, 89 S.Ct. at 959 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). This test requires a party seeking a declaratory judgment to have

"standing" and to demonstrate that the controversy is "ripe" for adjudication. Even where these requirements are satisfied at inception a case may be rendered moot by changing circumstances during the course of the litigation. When this occurs, justiciability is lost and the action must be dismissed when mootness is found. *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam); *Board of School Commissioners of Indianapolis v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975) (per curiam).

The defendant Austin does not contend that this case has become moot because the 1984 general election already has been held. That argument is foreclosed by *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *Bellotti* involved a challenge to a state criminal statute that forbade certain expenditures by banks and other corporations for the purpose of influencing the vote on referendum proposals. As in the present case, the plaintiff sought to have the statute declared unconstitutional. The particular proposal the plaintiff wanted to spend money to oppose was a constitutional amendment to permit the legislature to impose a graduated personal income tax. Before the case reached the Supreme Court the referendum was held and the proposal defeated. On this basis the defendant argued that the case had become moot. The Supreme Court disagreed, holding that "the case falls within the class of controversies 'capable of repetition, yet evading review.'" *Id.* at 774, 98 S.Ct. at 1414 (quoting *Southern Pacific Terminal Co. v. I.C.C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)).

The Court amplified its holding as follows:

Present here are both elements identified in *Weinstein v. Bradford*, 423 U.S. 147, 149 [96 S.Ct. 347, 348, 46 L.Ed.2d 350] (1975), as precluding a finding of mootness in the absence of a class action: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again."

Under no reasonably foreseeable circumstances could appellants obtain plenary review by this Court of the issue here presented in advance of a referendum on a similar constitutional amendment. In each of the legislature's four attempts to obtain constitutional authorization to enact a graduated income tax, including this most recent one, the period of time between legislative authorization of the proposal and its submission to the voters was approximately 18 months. This proved too short a period of time for appellants to obtain complete judicial review, and there is every reason to believe that any future suit would take at least as long. Furthermore, a decision allowing the desired expenditures would be an empty gesture unless it afforded appellants sufficient opportunity prior to the election date to communicate their views effectively.

*Bellotti*, 435 U.S. at 774, 98 S.Ct. at 1414.

**B.**

Though it did not articulate its conclusions fully, the district court appears to have held that the plaintiffs did not satisfy the ripeness requirement as to the Citizens Lobby proposal because it would not appear on the ballot before 1986 and that they had no standing with respect to Proposal A because the court found their affidavits not credible. Since we have determined that the controversy with respect to the Citizens Lobby proposal was ripe for adjudication we do not consider the court's alternative decision based on Proposal A.

The defendant maintains that the district court correctly determined that there was no justiciable controversy because the circumstances envisioned in the complaint did not materialize. No proposal described in the complaint, that is, one adversely affecting the utilities' ability to serve both their customers and their investors fairly, qualified for a place on the 1984 general election ballot. The defendant reasons that when this circumstance was made clear the plain-

tiffs were required to show that they intended to contribute more than $40,000 to a committee either opposing or supporting a proposal that did qualify for the 1984 general election ballot or suffer dismissal. They argue that the possibility of the Citizens Lobby proposal's qualifying for the 1986 general election ballot does not present a controversy of sufficient immediacy to satisfy the case or controversy requirement as defined by the courts.

On the other hand, the plaintiffs point out that unrefuted affidavits showed that the Citizens Lobby was continuing to circulate petitions to qualify its proposal for a constitutional amendment which would adversely affect the revenues of the utilities. The Citizens Lobby had succeeded in placing three proposals on ballots since 1974 and intended to submit its proposal, already approved as to form, for inclusion on the 1986 ballot. Furthermore, the plaintiff Consumers Power Co. had stated by affidavit that it specifically planned to contribute more than $40,000 to a committee opposing the Citizens Lobby proposal.

The plaintiffs contend that since the defendant had announced his intention to enforce § 54(3), and since the Citizens Lobby was continuing to take the necessary steps to qualify the proposal, the case was ripe for decision. The plaintiffs were exposed, they say, to "actual injury" based on the reasonable expectation that all parties will follow through on their intended courses of conduct, thus exposing the plaintiffs to criminal prosecution for exercising their First Amendment rights.

## IV.

### A.

Though *Bellotti* dealt primarily with mootness, there is implicit in that decision a holding that ripeness does not require the immediacy imposed by the district court in this case. The *Bellotti* Court made clear that a plaintiff seeking to express its views on a ballot proposal must have a reasonable time before the election date in which to wage its campaign. 435 U.S. at 774, 98 S.Ct. at 1414. In *Bellotti* the time between legislative authorization of the proposal and submission to the voters was approximately 18 months. "This proved too short a period of time for appellants to obtain complete judicial review, and there is every reason to believe that any future suit would take at least as long." *Id.*

Under Michigan law petitions proposing an amendment to the state constitution may be filed as late as 120 days before the election at which the proposal is to be voted upon. M.C.L.A. § 168.471. After processing by the Board, the proposal must be certified by the secretary of state to each county clerk in the state. This certification must take place "not less than 49 days before the election, in order for the proposal to appear on the ballot." M.C.L.A. § 168.480.

The requirement imposed by the district court in the present case would certainly not provide an opportunity for complete judicial review. The court held that the Citizens Lobby proposal could not furnish a basis for a justiciable controversy because it had not been certified and because the time for certification in 1984 had expired. The requirement that the Citizens Lobby proposal be certified—a step that can occur as late as seven weeks before election day—as an absolute condition for finding an actual case or controversy deprived the plaintiffs of any realistic opportunity for an adjudication prior to the election. Thus, an organization such as Citizens Lobby could always prevent a test of § 54(3) by waiting until the last day to file their petitions and counting on the time-consuming process of canvassing to make certain that the election would come and go before one seeking a declaratory judgment could obtain judicial review.

### B.

The Supreme Court reviewed earlier "case or controversy" holdings in *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 23201, 2308, 60 L.Ed.2d 895 (1979):

The basic inquiry is whether the "conflicting contentions of the parties … present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Assn. v. Corsi*, 326 U.S. 88, 93 [65 S.Ct. 1483, 1487, 89 L.Ed. 2072] (1945); see *Evers v. Dwyer*, 358 U.S. 202, 203 [79 S.Ct. 178, 179, 3 L.Ed.2d 222] (1958); *Maryland Casualty Co. v. Pacific Coal & Oil Co., supra.*

A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. *O'Shea v. Littleton*, 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). But "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 [43 S.Ct. 658, 663, 67 L.Ed. 1117] (1923); see *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143 [95 S.Ct. 335, 358, 42 L.Ed.2d 320] (1974); *Pierce v. Society of Sisters*, 268 U.S. 510, 526 [45 S.Ct. 571, 69 L.Ed. 1070] (1925). The Court then addressed the more specific instance of an attack on the constitutionality of a state criminal statute:

When contesting the constitutionality of a criminal statute, "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 [94 S.Ct. 1209, 1215, 39 L.Ed.2d 505] (1974); see *Epperson v. Arkansas*, 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968); *Evers v. Dwyer, supra*, [358 U.S.] at 204 [79 S.Ct. at 179]. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v.*

*Bolton*, 410 U.S. 179, 188 [93 S.Ct. 739, 745, 35 L.Ed.2d 201] (1973). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S. 37, 42 [91 S.Ct. 746, 749, 27 L.Ed.2d 669] (1971); *Golden v. Zwickler*, 394 U.S. 103 [89 S.Ct. 956, 22 L.Ed.2d 113] (1969). When plaintiffs "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible," they do not allege a dispute susceptible to resolution by a federal court. *Younger v. Harris, supra*, [401 U.S.] at 42 [91 S.Ct. at 749].

442 U.S. at 298–99, 99 S.Ct. at 2308–09.

### C.

■ Applying these principles to the present case, we conclude that the district court erroneously held that the plaintiffs failed to present an actual case or controversy. The plaintiffs demonstrated "a realistic danger of sustaining injury" as a result of the operation and enforcement of the statute. The defendant admitted he would enforce the law and there was no dispute that the plaintiffs intended to make the prohibited contributions. They were not required to suffer the injury in advance so long as injury was "impending." There was clearly a "credible threat of prosecution."

The fact that the Citizens Lobby proposal did not "make the cut" in 1984 did not doom this action. As the Court stated in *Bellotti*, there must be a reasonable opportunity for complete litigation of the issue. There existed a reasonable expectation that the Citizens Lobby would continue to press its proposal and that it would be successful in qualifying for a place on the ballot, since it had been successful on three occasions in the recent past. The district court correctly concluded in December 1983 that an actual case or controversy existed, based on the efforts of the Citizens Lobby to qualify its proposal and the determination of the utilities to contribute money to a

committee opposing adoption of the proposal. The fact that the proposal was not certified for the 1984 election did not change the posture of the case. The same actual controversy existed and required adjudication.

Several circuit and district court decisions support our conclusions. In *Athens Lumber Co., Inc. v. Federal Election Commission*, 689 F.2d 1006 (11th Cir.1982), *aff'd on rehearing en banc*, 718 F.2d 363 (1983), *cert. denied*, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984), a corporation and its president challenged the constitutionality of a section of the Federal Election Campaign Act that prohibits corporations from making direct political contributions and expenditures in federal elections. The district court held that "anticipated misconduct" and resulting prosecution for future illegal contributions were only speculative and did not present a "concrete dispute." *Athens Lumber Co., Inc. v. Federal Election Commission*, 531 F.Supp. 756, 764, 767 (M.D.Ga.1982). The court of appeals reversed the district court's finding of nonjusticiability with respect to both the corporation and its president. 689 F.2d at 1011–13. In reaching this conclusion the court of appeals relied primarily on the analysis by the Supreme Court in *Bellotti*, determining that the plaintiffs had demonstrated an intent to follow a course of conduct arguably involving First Amendment rights that would be impeded by enforcement of the statute.

The defendant attempts to distinguish *Athens Lumber* because there will be a federal election every two years and Athens Lumber Co. was certain to engage in the prohibited conduct. On the other hand, the defendant asserts, "it is not clear that any ballot proposal will qualify for the November, 1986 ballot." This argument disregards the fact that the Citizens Lobby had succeeded in placing initiatives on the ballot in 1974, 1976 and 1982 and that its executive director had confirmed by affidavit that the organization continued to circulate petitions for the very proposal that the utilities sought to oppose by contributions to a committee. We believe the plaintiffs established a "reasonable expectation" that the Citizens Lobby would continue to seek certification for its proposal and that the utilities would be "subject to the threat of prosecution." See *Bellotti*, 435 U.S. at 774–75, 98 S.Ct. at 1414–15.

Our conclusion is also supported by *Let's Help Florida v. Smathers*, 453 F.Supp. 1003 (N.D.Fla.1978), *aff'd sub nom. Let's Help Florida v. McCrary*, 621 F.2d 195 (5th Cir.1980), *aff'd mem. sub nom. Firestone v. Let's Help Florida*, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982), and *Democratic Party v. National Conservative Political Action Committee (NCPAC)*, 578 F.Supp. 797 (E.D.Pa.1983), *modified on other grounds*, —— U.S. ——, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). In *Let's Help Florida* a ballot question committee was found to have presented a justiciable issue in an action challenging a limitation on contributions even though petitions had not been filed and the measure had not been certified for the ballot. In NCPAC the court found that uncertainty as to the identity of the Republican candidate for President in an election more than a year in the future did not render nonjusticiable for lack of "ripeness" an action challenging a criminal statute that imposed spending limits in presidential elections. When a reasonable likelihood is established that events which will trigger the prohibited acts will occur, resulting in enforcement of a statute in a way that arguably infringes a plaintiff's First Amendment rights, a concrete dispute has been presented.

The plaintiffs have presented a controversy " 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Golden v. Zwickler*, 394 U.S. at 108, 89 S.Ct. at 959. The judgment of the district court is reversed and the cause is remanded for further proceedings. We have not considered, and thus do not express any opinion, on the merits of this case.